LEXMARK INTERNATIONAL, INC., Plaintiff-Appellee, v. TRANSPORTA-
TION INSURANCE COMPANY *et al.*, Defendants-Appellants.

First District (3rd Division) Nos. 1—01—0719, 1—01—0962 cons.

Opinion filed December 19, 2001.

Patrick E. Maloney, Katherine E. Tammaro, and Daneen D. Fitzpatrick, all of Tressler, Soderstrom, Maloney & Priess, of Chicago, for appellant American Motorists Insurance Company.

Michael Resis, Ellen L. Green, and Victor J. Piekarski, all of O'Hagan, Smith & Amundsen, L.L.C., of Chicago, for appellant Transportation Insurance Company.

John S. Vishneski III and Angela Elbert Dietz, both of Neal, Gerber & Eisenberg, of Chicago, and Gauntlett & Associates, of Irvine, California (David A. Gauntlett and Eric R. Little, of counsel), for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

The question before us is whether two insurance companies had a contractual duty to defend their insured in underlying causes of action. To answer that question we have to test the tensile strength of

factual allegations of the complaints filed against the insured in California and Kentucky courts.

## INTRODUCTION

In December 1999, plaintiff Lexmark International, Inc. (Lexmark), filed a second amended complaint for declaratory judgment against defendants Transportation Insurance Company (Transportation) and American Motorists Insurance Company (AMICO) (collectively, the Insurers) seeking a declaration the Insurers owed a duty to defend Lexmark in lawsuits brought against it by BDT Products, Inc., and Buro-Datentechnik GMBH & Co., KG (collectively BDT). The Insurers had issued general liability insurance policies to Lexmark.

In response to Lexmark's complaint, the Insurers filed, among other things, counterclaims seeking declarations they owed no duty to defend Lexmark because BDT's complaints against Lexmark did not contain allegations that created a potential for coverage under the Insurers' policies. That is, BDT's complaints did not contain allegations of "personal injury" or "advertising injury," as those terms are defined in the Insurers' policies.

Lexmark and the Insurers moved for summary judgment on the insurance coverage issue. In January 2001, the trial court granted summary judgment in Lexmark's favor, finding "there is a potential for coverage based upon the language contained in this [BDT's] Complaint." The trial court held the Insurers had a duty to defend Lexmark against BDT's lawsuits.

Both insurance companies contend the trial court erred in entering summary judgment in Lexmark's favor and erred in denying summary judgment in their favor. We agree.

We reverse the trial court's decision and remand this cause with directions to enter summary judgment for the insurance companies.

## FACTS

### THE INSURANCE COMPANIES' POLICIES

AMICO, an Illinois corporation with its principal place of business in Long Grove, Illinois, issued two comprehensive general liability policies to Lexmark, a Kentucky corporation with its principal place of business in Lexington, Kentucky. They were effective from April 3, 1997, to April 3, 1999.

Transportation, an Illinois corporation with its principal place of business in Chicago, Illinois, issued three commercial general liability policies to Lexmark. They were effective from March 27, 1994, to March 27, 1997.

The issues in this case arise out of AMICO and Transportation

policy coverage for personal injury and advertising injury claims brought against Lexmark. The pertinent provisions in the policies are almost identical:

"COVERAGE B—PERSONAL AND ADVERTISING INJURY COVERAGE

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies. We will have the right and the duty to defend any 'suit' seeking those damages ***.

* * *

b. This insurance applies to:

1) 'Personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

2) 'Advertising injury' caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the 'coverage territory' during the policy period."

The policies defined the term "personal injury":

" 'Personal injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person or organization occupies, if committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy."

The policies defined the term "advertising injury":

" 'Advertising injury' means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan."

## HISTORY OF BDT v. LEXMARK

On August 13, 1998, BDT filed a lawsuit against Lexmark in the superior court of the State of California, San Diego County (the California State Lawsuit). In BDT's California State Lawsuit complaint, it alleged Lexmark improperly acquired BDT's printer paper feed and handling technology and incorporated BDT technology into Lexmark's line of printers. BDT sought damages and other relief for (1) breach of contract (implied-in-fact), (2) breach of contract (implied-in-law), (3) misappropriation of trade secrets, (4) fraud and deceit, (5) unfair business practices, (6) tortious interference with business relationships, (7) breach of fiduciary duty, and (8) breach of confidence.

On September 9, 1998, Lexmark removed the California State Lawsuit to the United States District Court for the Southern District of California (the California Southern District Lawsuit). On September 11, 1998, BDT filed a first amended complaint. The allegations and prayer for relief of the first amended complaint were virtually the same as the California State Lawsuit complaint.

On or about September 28, 1998, BDT filed a separate complaint against Lexmark in the United States District Court for the Central District of California (the California Central District Lawsuit). The California Central District Lawsuit complaint was almost identical to the first amended complaint of BDT's California Southern District Lawsuit. Consequently, BDT dismissed the California Southern District Lawsuit on October 22, 1998.

On October 8, 1998, Lexmark filed a lawsuit against BDT seeking a declaratory judgment that, among other things, "Lexmark did not misappropriate any trade secrets belonging to the defendants[, BDT,] or engage in any wrongdoing with regard to defendants (or either of them) whatsoever." Lexmark filed the suit in the United States District Court for the Eastern District of Kentucky, Lexington Division.

On February 10, 1999, the California Central District Lawsuit was transferred to the United States District Court for the Eastern District of Kentucky. On August 3, 1999, BDT filed its first amended complaint in the Kentucky District Court (BDT's Kentucky Complaint).

BDT's Kentucky Complaint contained counts for (1) breach of contract (implied-in-fact), (2) breach of contract (implied-in-law), (3) misappropriation of trade secrets, (4) unfair competition, and (5) breach of confidence.

The general allegations of the Kentucky complaint tell the story of BDT's claims against Lexmark.

BDT alleged it was a design, development, and manufacturing corporation, organized under the laws of the State of California, with

its principal place of business in Irvine, California. For over 30 years, BDT has been one of the world leaders in paper singulation and feeding technology. Sometime in 1991, BDT and Lexmark began a joint development program on various projects. BDT worked closely with Lexmark's design engineers on advanced solutions in printer paper handling technology, that is, "sheet feed paper handling" for printers.

In 1992, BDT began production of a laser printer with multiple paper input trays and a variety of paper output options. BDT provided its production information and prototype printers to Lexmark for general evaluation and for Lexmark to consider possible custom applications of BDT's technology into Lexmark products.

BDT alleged that, for the next few years, it kept Lexmark apprised of its progress in paper singulation and feeding technology. BDT continued to disclose to Lexmark's engineers its confidential technology, trade secrets, and "general paper handling know-how." More specifically, BDT disclosed to Lexmark details concerning BDT's "critical trade secrets and paper singulation and feeding systems." BDT alleged it also continued to provide Lexmark with samples of its redesigned laser printer prototypes for in-house evaluation and testing by Lexmark's engineering staff.

After some time, BDT alleged Lexmark began developing its own new laser printer that would print 16 pages per minute. Lexmark allegedly asked BDT to develop and manufacture an output device and auxiliary trays for its new laser printer, which would later be named the "Optra S." In February 1995, BDT allegedly agreed to leave prototype products with Lexmark while the parties negotiated a formal development agreement.

In September 1995, however, BDT alleged that, after it had already disclosed to Lexmark the essential design aspects of its paper singulation and feeding technology, Lexmark's general manager of printer operations discontinued negotiations with BDT. Lexmark allegedly advised BDT it was pursuing "other options" with its laser printer program and was performing research and design functions for its laser printers "in-house."

According to BDT, it first became suspicious of Lexmark misappropriating its technology in January 1997. It was then that representatives of Lexmark tried to market its newest 16-page-per-minute laser printer—the Optra S—to BDT. The Lexmark salesman brought a prerelease Optra S printer to BDT's offices in Irvine, California. While displaying the printer, the Lexmark salesman mistakenly tried to insert one of BDT's display paper trays into Lexmark's printer.

BDT alleged that when the salesman mistakenly put BDT's display paper trays into Lexmark's printer, a senior Lexmark representative

commented to the effect that Lexmark "always takes BDT's ideas, and never pays for them." BDT also alleged its representatives noticed the paper singulation and feeding system utilized in Lexmark's new laser printer was nearly identical in appearance and function to BDT's system.

BDT alleged it was not permitted, however, to examine the internal mechanics of Lexmark's new laser printer. As such, BDT could not, at that time, confirm the extent to which Lexmark had allegedly stolen its paper singulation and feeding system.

According to BDT, its suspicions that Lexmark was misappropriating its technology were confirmed when BDT visited Lexmark's offices in February 1997 and again saw Lexmark's new paper trays for its Optra S printer, and, when, several weeks later, BDT obtained from Lexmark a prerelease copy of the User's Manual for the Optra S and saw a paper tray almost identical to BDT's prior design.

When Lexmark finally released its "new-generation" Optra S series of printers in May of 1997, BDT alleged, Lexmark's product announcements were in a language almost identical to BDT's promotional literature, in that Lexmark trumpeted its "Industry Leading Paper Handling," and its ability to "support the widest variety of media including challenging labels, signage and card stock."

According to BDT, months later, when it received an Optra S printer, it was then able to confirm that, indeed, "Lexmark had stolen its critical trade secrets and had incorporated BDT's paper singulation system, technology and know-how into its products."

BDT alleged it also was able to confirm Lexmark stole its technology when, in the fall of 1997, during an annual trade show, it visited Lexmark's display booth and was greeted by a Lexmark booth manager who congratulated BDT on its "exceptional design job," apparently under the wrong impression Lexmark had compensated BDT for the supply or license of its technology to Lexmark.

## DECISION

### STANDARD OF REVIEW

■ The parties filed cross-motions for summary judgment. When that happens, "the court is invited to decide the issues presented as a question of law." *Container Corp. of America v. Wagner*, 293 Ill. App. 3d 1089, 1091, 689 N.E.2d 259 (1997).

We review *de novo* the trial court's order granting summary judgment. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

■ The construction of these insurance policy provisions and a determination of the rights and obligations under them are questions of

law suitable for summary judgment. See *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390-91, 620 N.E.2d 1073 (1993).

## APPLICABLE LAW

■ Although the insurance companies suggest in their briefs that Connecticut law should apply here, no such claim was made in the trial court, where the parties were content with the application of Illinois law. The issue was waived and we will use the law of this state wherever we can. See *Commercial Discount Corp. v. Bayer*, 57 Ill. App. 3d 295, 299, 372 N.E.2d 926 (1978).

## DUTY TO DEFEND STANDARDS

■ The principles of law that attend an insurance company's duty to defend are firmly established:

"To determine an insurer's duty to defend its insured, the court must look to the allegations of the underlying complaints. If the underlying complaints allege facts within or *potentially* within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent. [Citation.] An insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage. [Citation.] Moreover, if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy. [Citation.]" (Emphasis in original.) *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73, 578 N.E.2d 926 (1991).

We need not restate the rules concerning ambiguities in an insurance policy since the parties agree there are no ambiguous terms in the provisions at issue. The key phrases—"personal injury" and "advertising injury"—are defined in the policies. The dispute centers on whether those provisions were triggered by the BDT lawsuits.

■ We give the policies' words their "plain, ordinary, and popular meaning." (Emphasis omitted.) *Outboard Marine Corp.*, 154 Ill. 2d at 108. We construe the underlying complaints liberally and resolve all doubts in favor of the insured. *La Grange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 869, 740 N.E.2d 21 (2000) ("For potentiality of coverage to exist, the complaint need present only a possibility of recovery, not a probability of recovery").

We give little weight to the legal label that characterizes the underlying allegations. Instead, we determine whether the alleged conduct arguably falls within at least one of the categories of wrongdo-

ing listed in the policy. See *La Grange Memorial Hospital*, 317 Ill. App. 3d at 869.

## OUTSIDE EVIDENCE

Lexmark urges us to consider the affidavit of Paul Rahenkamp, a Lexmark sales manager, and the deposition testimony of Glenn Klein, a BDT executive. The documents were submitted by Lexmark in the course of summary judgment proceedings in this case. Lexmark contends they include true but unpleaded facts that support its duty to defend claims.

■ The general rule, recited in case after case, is that "it is only the allegations in the underlying complaint, considered in the context of the relevant policy provisions, which should determine whether an insurer owes a duty to defend an action brought against an insured." *Bituminous Casualty Corp. v. Fulkerson*, 212 Ill. App. 3d 556, 562, 571 N.E.2d 256 (1991). Also see *Atlantic Mutual Insurance Co. v. American Academy of Orthopaedic Surgeons*, 315 Ill. App. 3d 552, 567, 734 N.E.2d 50 (2000) ("[W]here summary judgment is sought in the context of a declaratory judgment action to determine whether an insurer has a duty to defend, the use of extrinsic evidence is inappropriate").

Some courts have found exceptions to the general rule. Extrinsic evidence has been considered when it does not "impact upon the underlying plaintiff's ability to pursue a theory of liability or resolve any issue critical to the insured's liability in the underlying litigation." *Fremont Compensation Insurance Co. v. Ace-Chicago Great Dane Corp.*, 304 Ill. App. 3d 734, 743, 710 N.E.2d 132 (1999). The exception for true but unpleaded facts was not meant to be applied to situations where the only extraneous facts are supplied by the insured. *Shriver Insurance Agency v. Utica Mutual Insurance Co.*, 323 Ill. App. 3d 243, 251, 750 N.E.2d 1253 (2001).

We decline to move our analysis beyond the four corners of the California state and Kentucky federal complaints. Taken together, they provide a plethora of facts. Rahenkamp's affidavit and Klein's deposition are directed at the issues in the underlying case. To consider them, we would have to determine issues crucial to the BDT lawsuit. The trial judge saw no need to consider extrinsic evidence and neither do we.

Our inquiry into the merits of this case is confined to the California and Kentucky complaints filed by BDT. We, like the parties in their briefs, consider all the facts alleged in both complaints in a single analysis of the duty to defend question.

Lexmark did not buy insurance that specifically covered claims

against it for misappropriation of trade secrets. For Lexmark to succeed here, the factual allegations of the underlying complaints have to contend BDT suffered an injury arising out of one of the enumerated offenses in the policies and the offense was committed during the policy period.

The covered offense can be an "advertising injury" or a "personal injury." Lexmark says the complaints allege both. We consider separately the two categories of covered offenses, although Lexmark's claims overlap.

We note that each prayer for relief in the California and Kentucky complaints speaks to an injury caused by the wrongful obtaining and misusing of BDT's trade secret. Still, we understand a claim for relief is not essential to establish the duty to defend; "only the allegations in the complaint must fall within the covered provisions." *Sun Electric Corp. v. St. Paul Fire & Marine Insurance Co.*, No. 94—C—5846 (N.D. Ill. May 4, 1995). But see *Aetna Life & Surety Co. v. Northern Trust Co. of Illinois*, 169 Ill. App. 3d 678, 681, 523 N.E.2d 1043 (1988) (for what appears to be a stricter duty to defend test: "Most importantly, Baron's complaint did not allege in substance all the factual elements necessary to causes of action in malicious prosecution or abuse of process, and Northern has not shown how the complaint could have been amended to state such claims").

At any rate, specific claims aside, we perform a textual exegesis on the complaints to determine whether their factual allegations trigger the insurance companies' duty to defend.

## 1. Advertising Injury

The parties agree on how advertising injury coverage can be triggered. There are three elements: (1) Lexmark must have been engaged in advertising activity during the policy period when the injury occurred; (2) BDT's allegations must raise a potential for liability under one of the offenses listed in the policies; and (3) there must be a causal connection between the alleged injury and the advertising activity. See *Zurich Insurance Co. v. Sunclipse, Inc.*, 85 F. Supp. 2d 842, 852 (N.D. Ill. 2000).

## a. Advertising Activity

To satisfy the advertising activity requirement, Lexmark points to allegations that it circulated promotional literature, product announcements, and newsletters, and that it displayed, promoted, and sold the Optra S system—all the time claiming the BDT paper input and output system in its printer had been designed and created by Lexmark.

Lexmark's first obstacle to success concerns the question of advertising activity. There is no generally accepted definition of

"advertising activity" in the reported decisions, but this court, in a duty to defend context, has said: "The term 'advertising' has been held to refer to the widespread distribution of promotional material to the public at large." *International Insurance Co. v. Florists' Mutual Insurance Co.*, 201 Ill. App. 3d 428, 433, 559 N.E.2d 7 (1990).

■ We recognize, however, "The appropriate definition of advertising under Illinois law is by no means a settled issue." *Winklevoss Consultants, Inc. v. Federal Insurance Co.*, 991 F. Supp. 1024, 1031 n.9 (N.D. Ill. 1998) (*Winklevoss II.*) Lexmark contends it was accused of engaging in advertising activity by the allegation that it promoted and marketed its printer to potential customers. Despite our doubts about the soundness of Lexmark's position, we will, for the purpose of this opinion, assume Lexmark's promotional and marketing efforts constitute "advertising."

### b. Covered Offenses

We understand Lexmark to be contending three of the four advertising injury "offenses" listed in the policies are contained in the allegations of the BDT complaints. They are, according to Lexmark, "misappropriation of advertising ideas or style of doing business," "disparagement of BDT's goods, products, or services," and "infringement of slogan." We discuss each of them, bearing in mind BDT has alleged its paper tray design, which provides a method for moving and stacking paper, was wrongfully taken and incorporated into Lexmark's desktop laser printer, the printer Lexmark promoted and sold.

Our analysis of Lexmark's duty to defend claims begins with the proposition that a complaint charging trade secret misappropriation does not allege advertising injury. *Winklevoss II*, 991 F. Supp. at 1034-35; see also *Simply Fresh Fruit, Inc. v. Continental Insurance Co.*, 94 F.3d 1219, 1222 (9th Cir. 1996). This proposition from *Winklevoss II* was cited with approval in *McDonald's Corp. v. American Motorists Insurance Co.*, 321 Ill. App. 3d 972, 981, 748 N.E.2d 771 (2001), an insurance indemnity case.

Lexmark, to succeed, would have to find in one of the BDT complaints factual allegations of a listed advertising injury other than trade secret misappropriation.

(1) Misappropriation of advertising ideas or style of doing business

Lexmark's "misappropriation" theory centers on its belief there are "trade dress" infringement references in the BDT complaints. In paragraph 17 of the Kentucky federal action BDT says there was a time when "BDT's representatives noticed that the paper singulation and feeding system utilized in Lexmark's new printer was nearly identical in appearance and function of Lexmark's new product ***."

In paragraph 18 of the Kentucky complaint BDT tells how it became suspicious of Lexmark's new paper singulation system for the Optra S printer and how those "suspicions were confirmed several weeks later, when it obtained from Lexmark a pre-release copy of the User's Manual for the Optra S, and observed a paper singulation system virtually identical to BDT's prior design."

Lexmark's trade dress infringement theory rests most heavily on paragraph 34 of the California state court complaint, which alleges, in part:

> "34. Lexmark's misappropriation of BDT's trade secrets, and its outright copying of BDT's 'trade dress,' and its promotional statements that it owns the design to the complete Optra S design has also created profound, actual confusion in the finite marketplace in which BDT competes as to the origination of what is, in fact, a BDT-designed feed-arm and angled wall paper tray ***."

■ Although there is no Illinois decision directly on point, as is true of almost all of the issues in this case, there is sufficient other authority for us to agree with Lexmark that "misappropriation of advertising ideas or style of doing business" encompasses trade dress infringement claims. See *B.H. Smith, Inc. v. Zurich Insurance Co.*, 285 Ill. App. 3d 536, 539-40, 676 N.E.2d 221 (1996) (New York law provides trademark infringement claim is covered under the offense of misappropriation of style of doing business); see also *Dogloo v. Northern Insurance Co.*, 907 F. Supp. 1383 (C.D. Cal. 1995).

Other than the conclusory phrase "outright copying of BDT's 'trade dress,' " the complaints contain no factual allegations of trade dress infringement. Actually, the complaints obviate any trade dress infringement claim.

The trade dress of a product is essentially "its total image and overall appearance." *Blue-Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989). The total image of a product "may include features such as size, shape, color or other combinations, texture, graphics, or even particular sales techniques." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983). *Blue-Bell Biomedical* and *John H. Harlan Co.* were cited with approval by the United States Supreme Court in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1, 120 L. Ed. 2d 615, 621 n.1, 112 S. Ct. 2753, 2755 n.1 (1992) (Only nonfunctional, distinctive trade dress is protected under section 43(a) of the Lanham Act (15 U.S.C. § 1125(a) (1982)).

No "passing off" is alleged by BDT. That is, there is no claim Lexmark was trading on the total image or appearance of the BDT paper tray. Decisions relied on by Lexmark "involved allegations that an insured was trading on the recognizable name, mark, or product

configuration (trade dress) of the underlying plaintiff." *Frog, Switch & Manufacturing Co. v. Travelers Insurance Co.*, 193 F.3d 742, 749 (3d Cir. 1999).

In fact, according to the complaints, the paper tray could not be identified merely by looking at the printer which incorporated the design. Even the BDT people could not do that. They had to wait until the Lexmark manual came out before they concluded their design had been misappropriated. It is the theft of a product design that is alleged by BDT, not the misappropriation of advertising or marketing ideas. See *Winklevoss II*, 991 F. Supp. at 1038-39.

In addition, BDT's allegations are centered on the function, not the appearance, of the paper tray. Trade dress has nothing to do with function. In fact, they are mutually exclusive.

Our examination of the California and Kentucky complaints finds no factual allegations of trade dress infringement against Lexmark.

### (2) Disparagement of BDT's goods, products, or services

Lexmark contends the BDT complaints allege Lexmark promoted and advertised its products in a way that disparaged BDT's paper tray. They did that, says Lexmark, by accusing Lexmark of belittling BDT's paper tray and by defaming it, a libel *per quod*. To support its contention Lexmark points to allegations that half of BDT's customers held off doing business with BDT because Lexmark falsely advertised that it developed the design of the paper tray.

Disparagement has been defined as "words which criticize the quality of one's goods or services." *Crinkley v. Dow Jones & Co.*, 67 Ill. App. 3d 869, 877, 385 N.E.2d 714 (1978). See also *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 620, 663 N.E.2d 1 (1995) (disparagement is a "defamation of the quality of one's goods and services").

To qualify as "disparagement," there must be " 'statement[s] about a competitor's goods which [are] untrue or misleading and [are] made to influence or tend to influence the public not to buy.' " *Zurich Insurance Co. v. Sunclipse, Inc.*, 85 F. Supp. 2d 842, 855-56 (N.D. Ill. 2000), quoting *Sentex Systems, Inc. v. Hartford Accident & Indemnity Co.*, 882 F. Supp. 930, 944 (N.D. Cal. 1994). Disparagement has been found where there are allegations the insured, in its advertising, criticized the quality of the underlying plaintiff's product as being inferior. *Knoll Pharmaceutical Co. v. Automobile Insurance Co. of Hartford*, 152 F. Supp. 2d 1026, 1038-39 (N.D. Ill. 2001).

Nowhere in the underlying complaints does BDT claim Lexmark referred to BDT or BDT's products when advertising or promoting the Lexmark printer. The complaints say BDT's customers "were reluctant

to engage in new business prospects with BDT" because it "could lead them into litigation with Lexmark" or "cause them delay in getting their products to the exceedingly time-sensitive computer marketplace." That is, not because Lexmark criticized the quality of BDT's paper tray.

The line we draw is the same one that separates *Winklevoss II* from *Winklevoss Consultants, Inc. v. Federal Insurance Co.*, 11 F. Supp. 2d 995 (N.D. Ill. 1998) (*Winklevoss III*). In *Winklevoss II*, the court held the underlying plaintiff, Lynchval, had not alleged disparagement of its product: "There is nothing in the complaint to suggest that Winklevoss said anything at all about Lynchval—let alone anything negative or misleading—or did anything other than promote its own product." *Winklevoss II*, 991 F. Supp. at 1039-40. It was clear to the district court judge, as it is to us in this case, that the wrongdoing alleged by the underlying plaintiff was that Winklevoss had developed its product by misappropriating trade secrets, not that Winklevoss misled the public with negative statements about the plaintiff's products.

For one reason or another, the underlying plaintiff in the *Winklevoss* case filed an amended complaint, giving rise to *Winklevoss III*. This time, Winklevoss was accused of making false statements about the speed of its software, comparing it to Lynchval's less efficient software. Making false and misleading negative statements about Lynchval's products in the course of advertising in violation of Lanham Act section 43(a)(2) was enough to trigger the insurance company's duty to defend. *Winklevoss III*, 11 F. Supp. 2d at 998.

To find allegations of disparagement of BDT or BDT's product, that is, belittling or libel *per quod*, not only would we have to stretch the words of the BDT complaints, we would have to rewrite them. We decline to do so.

### (3) Infringement of BDT's slogans

The third and final way Lexmark seeks "advertising injury" coverage is the contention that BDT alleged Lexmark infringed on its slogans. Lexmark relies on allegations in paragraphs 19 of the Kentucky complaint, where BDT said Lexmark's product announcements "trumpeted Lexmark's 'Industry Leading Paper Handling' " and Lexmark's "ability to support the widest variety of media including challenging labels, signage and card stock," and on paragraph 21, where Lexmark was accused of marketing its new printers as a "bold new breed" and "an entirely new generation," which offers "versatile paper handling options for the most demanding printing needs."

There are no factual allegations that Lexmark lifted any of BDT's

advertising slogans. The word "slogan" does not appear in the BDT complaints. Nor does BDT allege the words of any of its own advertising ideas. BDT never claimed ownership or exclusive right to the language it accused Lexmark of using. See *Sorbee International Ltd. v. Chubb Custom Insurance Co.*, 735 A.2d 712, 714-15 (Pa. Super. 1999) (candy manufacturer did not infringe on competitor's slogan by advertising its product as "low calorie," "sugar free," "fat free," and "cholesterol free"). See also *Ross v. Briggs & Morgan*, 540 N.W.2d 843, 846, 848 (Minn. 1995) (dermatologist did not infringe on competitor "Institute of Cosmetic Surgery and Hair Transplants" by advertising itself as "Institute of Cosmetic and Laser Surgery").

 We have found no Illinois decisions that would guide our consideration of when an infringement of slogan has been alleged. We are persuaded, however, the facts alleged in the BDT complaints do not fall within the "infringement of slogan" offense covered by the Insurers' policies. A contrary decision would constitute an unnecessary inhibition on the ability of a company to advertise its wares.

Because we find no "advertising injury" alleged in the underlying complaints, we see no need to determine whether BDT alleged its injuries were caused by the misappropriation of its trade secret, not by Lexmark's advertising. But see *International Insurance Co.*, 201 Ill. App. 3d at 433 ("The fact that the purpose of FTD's Rule 18(b) was to protect its advertising investment is of no consequence when the injury [antitrust violations] is alleged to have been caused, not by the advertising, but by the rule").

### 2. Personal Injury

It appears to us that Lexmark's "personal injury" contentions are a repeat of the claims it made under the "advertising injury" offenses listed in the policies—disparagement of BDT's goods, products, or services by belittlement or libel *per quod*. Our conclusions are the same. We find no personal injury allegations that trigger the insurance companies' duty to defend.

### CONCLUSION

We find BDT's allegations against Lexmark in the underlying complaints do not potentially fall within the coverage of the Insurers' policies. The Insurers have no duty to defend Lexmark. We reverse the trial court's grant of summary judgment to Lexmark and remand this cause with directions to enter summary judgment for the insurance companies.

Reversed and remanded.

HALL, P.J., and SOUTH, J., concur.