In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3582

RIGHT FIELD ROOFTOPS, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CHICAGO CUBS BASEBALL CLUB, LLC,
*et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 551 — **Virginia M. Kendall**, *Judge.*

ARGUED MAY 23, 2017 — DECIDED SEPTEMBER 1, 2017

Before BAUER, EASTERBROOK, and RIPPLE, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiffs-appellants Right Field Rooftops, LLC, doing business as Skybox on Sheffield; Right Field Properties, LLC; 3633 Rooftop Management, doing business as Lakeview Baseball Club; and Rooftop Acquisition, LLC (the "Rooftops"), filed suit against defendants-appellees

Chicago Baseball Holdings, LLC; Chicago Cubs Baseball Club, LLC; Wrigley Field Holdings, LLC; and Thomas S. Ricketts (the "Cubs"), alleging that the Cubs violated antitrust laws and breached an agreement in which the Rooftops provide the Cubs 17% of their profits in exchange for the Cubs' promise not to obstruct the view of Wrigley Field (the "License Agreement").

The Rooftops control two buildings and businesses that sell tickets to view Cubs games and other events at Wrigley Field. Both businesses are situated on the 3600 block of North Sheffield Avenue in Chicago, Illinois. Spectators have long enjoyed a view into Wrigley Field from the roofs of the buildings on Sheffield and Waveland Avenues. In the mid-1980's, rooftop owners gradually converted their flat-topped roofs into bleacher-style grandstands and formed businesses to serve the growing market for viewing Cubs games and other Wrigley Field events. In 1998, the City of Chicago enacted an ordinance formally allowing the rooftop businesses to operate for profit. By 2002, there were eleven such businesses.

In 2000, the City began the process of naming Wrigley Field a landmark. While the landmarking process unfolded, the Cubs announced a proposal to expand the Wrigley Field bleachers in 2001. Prior to the 2002 Major League Baseball season, the Cubs installed a large green windscreen above the outfield bleachers, obstructing the views from the rooftop businesses on Sheffield Avenue.

On December 16, 2002, the Cubs filed suit against a number of rooftop businesses, including the Rooftops, claiming that they were misappropriating Cubs' property by charging

admission fees to watch Cubs games.[1] Prior to the 2004 baseball season, the parties settled the suit by entering into the License Agreement, in which the rooftop businesses agreed to pay the Cubs 17% of their gross revenues in exchange for views into Wrigley Field. The License Agreement expires on December 31, 2023. Section 6 of the License Agreement contemplated the expansion of Wrigley Field and established protocols to facilitate such an expansion. The pertinent provisions are as follows:

> 6.    Wrigley Field bleacher expansion.
>
> 6.1   If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the view from any Rooftop into Wrigley Field such that the Rooftop's business is no longer viable unless it increases the height of its available seating, then such Rooftop may in its discretion lect to undertake construction to raise the height of its seating to allow views into Wrigley Field and the Cubs shall reimburse the Rooftop for 17% of the actual cost of such construction.
>
> 6.2   If the Cubs expand the Wrigley Field bleacher seating and such expansion so impairs the View from any Rooftop into Wrigley Field such that the Rooftop's

---

[1]  *See Chi. Nat'l League Ball Club, Inc. v. Skybox on Waveland, et al.*, No. 02 C 9105, United States District Court for the Northern District of Illinois.

business is no longer viable even if it were to increase its available seating to the maximum height permitted by law, and if such bleacher expansion is completed within eight years from the Effective Date, then if such Rooftop elects to cease operations … the Cubs shall reimburse that Rooftop for 50% of the royalties paid by that Rooftop to the Cubs …

…

6.4 If the Cubs expand the Wrigley Field bleacher seating and such expansion impairs the view from any Rooftop into Wrigley Field such that the Rooftop's Gross Revenue in the year of expansion is more than 10% below the average Gross Revenue for that Rooftop in the two years prior to expansion … then the affected Rooftop can seek a reduction in the Royalty rate for all subsequent years of the Term … .

6.5 Nothing in this Agreement limits the Cubs' right to seek approval of the right to expand Wrigley Field or the Rooftops' right to oppose any request for expansion of Wrigley Field.

6.6 The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops, provided however that tempo-

> rary items such as banners, flags, and decorations for special occasions, shall not be considered as having been erected to obstruct views of the Rooftops. Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section.

On February 11, 2004, the City completed the landmarking process; Wrigley Field's landmark designation limited future alterations to the field. However, following the 2005 baseball season, the Cubs were permitted to add approximately 1,790 bleacher seats.

In Fall 2009, the Ricketts family and certain related entities purchased 95% of the Cubs and acquired Wrigley Field from the Tribune Company. The acquisition was subject to the preexisting License Agreement. Shortly thereafter, the Cubs began to acquire ownership interests in a number of the rooftop businesses,[2] but failed in their attempt to purchase all of them. In 2010, the Cubs announced plans to install a

---

[2] The Cubs first acquired "Down the Line," a rooftop business located at 3621 N. Sheffield. In total, six rooftop businesses changed hands: three to the Cubs and three to unrelated investors. In conjunction with their Rule 59(e) motion, the Rooftops provided documentation showing that the holding companies that acquired six of the rooftop properties were owned by Greystone, LLC, which in turn was owned by Northside Entertainment Holdings, LLC. Northside, of which Ricketts serves as the executive vice president, owns and operates the Chicago Cubs.

"Toyota" sign in left field. Ricketts stated that the sign "[would not] affect any rooftops and everyone will be able to see."

In early 2012, the Cubs sought approval from the City for several Wrigley Field renovations, including bleacher seating expansion, an outfield sign package, and two video boards. On April 15, 2013, the Cubs announced a new renovation plan, which included a 6,000-square-foot video board in left field and a 1,000-square-foot billboard in right field. The Cubs released a mock-up of its proposed renovation on May 28, 2013, to all the rooftop business owners, which revealed that the rooftop businesses would be largely blocked by the construction.

After numerous meetings and public hearings stretching out over two years, where a number of rooftop businesses appeared and objected to the proposed construction, the Chicago Plan Commission, City Council, and Commission on Chicago Landmarks approved the Cubs' plan, including the construction of the bleachers, video boards, and billboards. The City approved the Cubs' final plan to construct a total of eight outfield signs above the bleachers, including a video board in both left and right field.

During the approval process, the Rooftops contend that Cubs' representatives used the threat of blocking rooftop views as leverage to force a sale of the rooftops to the Ricketts at below-market prices. The Rooftops allege that the Cubs demanded the Rooftops set minimum ticket prices and that the failure to do so would lead to having their views blocked. Once the City approved the Cubs' initial construction plan in July 2013, the Rooftops allege that the Cubs engaged a number of

rooftop business owners in strong-arm negotiations to pur-chase their properties. In May 2014, Ed McCarthy, one of the owners of the Rooftops, proposed a potential sale to the Cubs of both Rooftops. McCarthy offered to sell the Rooftops to the Cubs for fair market value, but was met by a Cubs representa-tive stating that McCarthy should accept whatever sale terms the Cubs offer because the buildings would be worth nothing once they no longer had views into Wrigley Field. The Cubs offered McCarthy a significantly lower price, and McCarthy refused. The Cubs also told McCarthy that they would block any rooftop business they did not purchase.

At the annual Cubs Convention held in January 2014, in response to a question regarding the construction at Wrigley Field, Ricketts stated:

> It's funny—I always tell this story when someone brings up the rooftops. So you're sitting in your living room watching, say, Showtime. All right, you're watching "Homeland." You pay for that channel, and then you notice your neighbor looking through your window watching your television.
>
> And then you turn around, and they're charging the other neighbors to sit in the yard and watch your television. So you get up to close the shades, and the city makes you open them. That's basically what happened.

The Rooftops contend that the audience, populated by the media and ticket-purchasing fans, interpreted this statement as

an accusation that the Rooftops were stealing the Cubs' property.

The Cubs began construction on their expansion project in September 2014. The Cubs removed the outfield outer walls, purchased approximately fifteen feet of sidewalk and street on Waveland and Sheffield Avenues, increased the bleachers' seating capacity by several hundred, and increased the bleachers' height by approximately 40 feet. In total, the construction entails new seats in the outfield bleachers, a new "fan deck" in the bleachers, increased concessions, signs and video boards, and new light systems.

The Rooftops filed suit against the Cubs on January 20, 2015, seeking relief for: (1) attempted monopolization; (2) false and misleading commercial representations, defamation, false light, and breach of the non-disparagement provision; and (3) breach of contract. Three weeks later, the Rooftops sought a temporary restraining order and a preliminary injunction enjoining the Cubs from constructing a video board. The district court conducted a hearing, and on February 19, 2015, it denied the motion for a TRO. On April 2, 2015, the court denied the Rooftops' motion for a preliminary injunction. The Cubs moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The court granted the Cubs' motion with prejudice on September 30, 2015.

Specifically, it dismissed the monopolization claims because: (1) Major League Baseball's antitrust exemption applies to the Cubs; (2) the Rooftops failed to establish a plausible relevant market; and (3) the Cubs cannot be limited by antitrust law from distributing their own product. It

dismissed the breach-of-contract claim because the plain language of the contract did not limit expansions to the seating capacity of Wrigley Field. The court dismissed the six remaining counts related to Ricketts' statements because the Rooftops failed to plausibly allege any "actionable false statement of fact."

The Rooftops moved to alter or amend the judgment under Rule 59(e) and to file an amended complaint under Rule 15(a). The Rooftops claimed to have discovered "new evidence" in the form of public deeds from January and May 2015, indicating that a corporate entity other than the Chicago Cubs had purchased the competing rooftops. The Rooftops sought to amend their antitrust claims: (1) to allege that "the business in which the Rooftops are involved is not the 'business of baseball;'" (2) to modify the relevant market to include occasional non-baseball events at Wrigley Field; and (3) to allege that the Cubs have no right to "sell views into Wrigley Field."

The court denied both motions. It held that the Rooftops were not entitled to relief under Rule 59(e) because the new evidence was actually a matter of public record and readily available, and therefore could not be considered "newly discovered." It also held that amending the complaint would be futile because, even with the proposed amendments, the Rooftops' antitrust claims would still be subject to the baseball exemption and lacked a plausible relevant market. This appeal followed.

## I. DISCUSSION

We review *de novo* a district court's decision granting a motion to dismiss under Rule 12(b)(6), accepting all well-pleaded factual allegations in the complaint as true and drawing all reasonable inferences in favor of the appellants. *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016). To avoid dismissal, the complaint must "state a claim to relief that is plausible on its face." *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 862 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

On appeal, the Rooftops challenge the district court's dismissal of their attempted monopolization, breach-of-contract, and breach of the non-disparagement provision claims. The Rooftops also contend that district court erred in denying their motion to amend. We will address each argument in turn.

### A. Attempted Monopolization

The Rooftops contend that certain conduct by the Cubs constitutes monopolistic behavior in violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*, including: attempting to set a minimum price for tickets; attempting to purchase all rooftop businesses; acquiring several rooftop businesses, threatening to obstruct views of rooftop businesses if they refuse to sell to the Cubs; and constructing the video board that blocks the Rooftops' views.

The Supreme Court first exempted the business of baseball from federal antitrust laws almost a century ago in *Federal Baseball Club of Baltimore v. National League of Professional*

*Baseball Clubs*, 259 U.S. 200 (1922). In *Federal Baseball*, the Court held that the Sherman Act had no application to the "business [of] giving exhibitions of base ball" because such "exhibitions" are "purely state affairs." *Id*. at 208. In *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 357 (1953) (per curiam), the Court reaffirmed *Federal Baseball*'s holding, reasoning that the business of baseball had "been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation." Therefore, "if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation." *Id*. Finally, in *Flood v. Kuhn*, 407 U.S. 258, 283–84 (1972), the Court noted that Congress had acquiesced in the baseball exemption and thus "by its positive inaction … clearly evinced a desire not to disapprove [it] legislatively." *See Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978) (discussing *Federal Baseball* and its progeny before concluding that "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws.").

Eventually, Congress took action to narrow the scope of the baseball exemption in 1998 with the passage of the Curt Flood Act, 15 U.S.C. § 26b. The Act established that "the conduct, acts, practices, or agreements of persons in the business of organized professional major league baseball directly relating to or affecting employment of major league baseball players … are subject to the antitrust laws … ." 15 U.S.C. § 26b(a). The Rooftops do not—and cannot—plausibly contend that this carve-out applies to the Cubs' conduct, as it is unrelated to the employment of Major League Baseball players.

Instead, the Rooftops argue that their claims are outside the scope of the baseball exemption because they do not concern the "rules and restrictions related to baseball itself." As an initial matter, the Rooftops' suggested "rules and restrictions" litmus test is not supported by case law. However, we have recognized limits to the scope of the exemption. In *Charles O'Finley*, we found that "[the] exemption does not apply wholesale to all cases which may have some attenuated relation to the business of baseball." 569 F.3d 541 n.51. But we do not view the Cubs' conduct as attenuated to the business of baseball. By attempting to set a minimum ticket price, purchasing rooftops, threatening to block rooftops with signage that did not sell to the Cubs, and beginning construction at Wrigley Field, the Cubs' conduct is part and parcel of the "business of providing public baseball games for profit" that *Federal Baseball* and its progeny exempted from antitrust law. *See Toolson*, 346 U.S. at 357.

The Rooftops also contend that the exemption is inapplicable to Count II, which involved the acquisition of other rooftop businesses, because Ricketts, rather than the Cubs, engaged in the anticompetitive conduct. The district court dismissed this argument, recognizing that the Supreme Court applied the baseball exemption in *Toolson*, in which the defendants included both the owner and general manager of the Cincinnati Baseball Club. *See Corbett v. Chandler*, 202 F.2d 428 (6th Cir. 1953) (per curiam), *aff'd sub nom.*, *Toolson*, *supra*. We agree with the district court.

Finally, the Rooftops argue that the exemption is inapplicable because their business is "not to publicly display baseball games," but instead "to sell views of live events inside"

Wrigley Field, including concerts, Big 10 football games, and professional hockey games. As the Cubs correctly point out, this contention is at odds with their complaint, which alleges attempted monopolization of "the market for watching Live Cubs Games." It is also belied by the Rooftops' brief, which concedes, as it must, that "the most significant portion of the Rooftops' current business is to sell views of Cubs games … ." Nonetheless, the business model of the Rooftops is not determinative. The relevant inquiry is whether the Cubs' challenged conduct falls within the business of providing public baseball games for profit, and we have already found that it does. Consequently, the Rooftops' antitrust claims are subject to the baseball exemption, and were properly dismissed.[3]

## B. Breach of Contract

The Rooftops contend that the Cubs violated the License Agreement by constructing the video board that blocks the views of Wrigley Field from the Rooftops.[4] Section 6.6 of the License Agreement states the following: "The Cubs shall not erect windscreens or other barriers to obstruct the views of the Rooftops … . Any expansion of Wrigley Field approved by governmental authorities shall not be a violation of this Agreement, including this section."

---

[3] Having determined that the antitrust claims were properly dismissed, we will forego an analysis of the Rooftops' relevant market and distribution arguments.

[4] Although the Rooftops' complaint seeks relief for an anticipatory breach of contract, we will analyze this claim as a breach of contract, as the district court did, because the video board has been constructed.

The basic rules of contract interpretation under Illinois law are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) (citation omitted). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id*. (citation omitted). A contract must be construed as a whole, viewing each provision in light of the other provisions. *Id*. (citation omitted). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004) (citation omitted). However, if the language of the contract is susceptible to more than one meaning, it is ambiguous. *Gallagher*, 874 N.E.2d at 58 (citation omitted). If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent. *Id*.

The Rooftops argue that the entirety of § 6 contemplates bleacher expansion, including remedies for various types of bleacher expansion such as sharing the cost of increasing the height of the Rooftops' seating (§§ 6.1, 6.3), or renegotiating the royalty rate (§ 6.4). The Rooftops' argument relies in part on the fact that the title of § 6 is "Wrigley Field bleacher expansion[.]" Thus, the Rooftops conclude that the term "any expansion" in § 6.6 refers only to the expansion of bleacher seating, rendering the construction of the video board a violation of the License Agreement. We disagree.

As an initial matter, we note that the Rooftops' argument is contrary to the plain, unambiguous language of the provision. If the parties wished to clarify that "any expansion" meant

"bleacher expansion," they could have done so. This is particularly evident in light of the fact that every reference to an expansion in §§ 6.1 through 6.4 specifies "bleacher seating" expansion, and only §§ 6.5 and 6.6 use the general term "expansion." "[W]hen parties to the same contract use such different language to address parallel issues … it is reasonable to infer that they intend this language to mean different things." *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) (analyzing Illinois law). Thus, we presume that the use of the general term "any expansion" in §§ 6.5 and 6.6 is an intentional departure from the prior sections' use of "bleacher seating" expansion.

In response, the Rooftops, relying on *BeerMart, Inc. v. Stroh Brewery Co.*, 804 F.2d 409, 411 (7th Cir. 1986), argue that "where the parties have agreed upon a specific term, an apparently inconsistent general statement must yield to the more specific term." The Rooftops contend that the prohibition on "windscreens and other barriers" is a specific term, and the exception of "any expansion" is a general term that must yield. First, we note that *BeerMart* analyzed Indiana law, not Illinois. However, even if this principle of construction is applicable under Illinois law, it is only applicable where a specific and general term "cannot stand together." *BeerMart*, 804 F.2d at 411. These two sentences are not inconsistent or contradictory. The second sentence clarifies that the prohibition of windscreens and other barriers in the first sentence is not applicable to any government-approved expansion. Therefore, *BeerMart*'s construction principle is inapplicable.

The Rooftops argue that our proposed construction renders the first sentence of § 6.6 meaningless. In their view, the video

board is a barrier that obstructs the view of the Rooftops. Following their train of logic, a video board or any other construction that blocks views into Wrigley Field, whether government-approved or not, would be impermissible under the License Agreement. But this assertion is contrary to the plain language of the provision, which carved out government-approved expansion from the list of prohibited items. Section 6.6 makes it clear that any government-approved expansion "shall not be in violation of this Agreement, *including this section*." (emphasis added). This is in direct reference to the prohibition on windscreens or other barriers in the preceding sentence. Again, the Rooftops' interpretation asks us to ignore the plain language of the provision. The first sentence is not meaningless; any windscreen or other barrier that is not government-approved is still prohibited under the License Agreement.

The Rooftops also argue that our reading of § 6.6 disharmonizes the other provisions of the License Agreement, specifically the 17% royalty provision in § 3. The Rooftops contend that if the royalty obligation remains in "full-force" despite their obstructed views, they will have "assumed enormous risks and got nothing in return." *See Curia v. Nelson*, 587 F.3d 824, 832 (7th Cir. 2009). The Rooftops fail to acknowledge that to the extent their revenues are negatively impacted by the video board, the Cubs' royalties will decrease proportionately.

But more to the point, the Rooftops fail to acknowledge that a primary function of a contract is to allocate risks between parties. Here, the risk is that future expansions of Wrigley Field will obstruct the Rooftops' views. Section 6.5

provides a mechanism for the parties to dispute the Cubs' proposed expansion projects. Section 6.6 declares that if the Cubs prevail in the dispute, their projects may proceed. That is precisely what occurred here—the Rooftops vigorously opposed the Cubs' expansion efforts, but ultimately lost. The parties were free to allocate risk in a different manner, but chose not to do so. *See McClure Eng'g Assocs., Inc. v. Reuben H. Donnelly Corp.*, 447 N.E.2d 400, 402–03 (Ill. 1983) (recognizing "a widespread policy of permitting competent parties to contractually allocate business risks as they see fit." (collecting cases)). Absent a defect in the negotiation process, such as disparity in bargaining power, absence of meaningful choice on the part of one party, or the existence of fraud, duress, or mistake, we will not second-guess that allocation. *Dana Point Condo. Ass'n, Inc. v. Keystone Serv. Co., a Div. of Cole Coin Operated Laundry Equip., Inc.*, 491 N.E.2d 63, 66 (Ill. App. Ct. 1986).

We do not view the royalty provision in § 3 as an inappropriate allocation of risk. Similarly, we do not find that our reading of the License Agreement "disharmonizes" the marketing promotion provision in § 7, as even with obstructed views, both parties benefit financially by the Cubs' continued promotion of the Rooftops.

Because the video board falls within the plain language of the carve-out for government-approved expansions in § 6.6, we find that it is not in violation of the License Agreement. Accordingly, the Rooftops' breach of contract claim fails.

### C. Non-Disparagement Provision

In addition to § 6, the Rooftops argue that Ricketts violated § 8.2, the License Agreement's non-disparagement provision, with his remarks at the 2014 Cubs Convention.[5] Section 8.2 states that "[t]he Cubs will not publicly disparage, abuse or insult the business of any Rooftop or the moral character of any Rooftop or any Rooftop employee." Under Illinois law, disparagement is defined as "statements about a competitor's goods which are untrue or misleading and are made to influence or tend to influence the public not to buy." *Lexmark Int'l, Inc. v. Transp. Ins. Co.*, 761 N.E.2d 1214, 1225 (Ill. App. Ct. 2001) (citation and brackets omitted). The district court found that the Rooftops failed to establish that Ricketts' statement was untrue or misleading. We agree.

Ricketts voiced his opinion as to the nature of the relationship between the Cubs and the Rooftops at the 2014 Cubs Convention. Illinois courts have refused to find this type of hyperbolic, opinion statement as actionable. *See Xlem Dewatering Solutions, Inc. v. Szablewski*, No. 5-14-0080, 2014 WL 4443445, *5 (Ill. App. Ct. Sept. 8, 2014) ("[S]tatements of opinion cannot form the basis for a commercial disparagement claim." (citation omitted)); *Pease v. Int'l Union of Operating Eng'rs Local 150, et al.*, 567 N.E.2d 614, 619 (Ill. App. Ct. 1991)

---

[5] Ricketts' remarks also formed the basis of the Rooftops' claims under the Lanham Act, the Uniform Deceptive Trade Practice Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act, as well as claims for defamation and false light. The Rooftops do not challenge the dismissal of these claims, and thus we limit our discussion to the breach of the non-disparagement provision of the License Agreement.

("Words that are mere name calling or found to be rhetorical hyperbole or employed only in a loose, figurative sense have been deemed nonactionable." (citation omitted)). We do not find Ricketts' statement to be "untrue or misleading," as it is not a factual assertion whose veracity can be proven.

Furthermore, it is not the type of statement that Illinois courts have found to be "untrue or misleading[.]" In *Pekin Insurance Company v. Phelan*, the defendant attempted to lure customers away from her employer's salon by falsely telling them that the salon was either closing or moving to a new location. 799 N.E.2d 523, 524 (Ill. App. Ct. 2003). In addition to telling customers that the salon was relocating, she provided them with the address of her newly opened salon. *Id*. The court found her statements to be untrue and misleading. *Id*. at 526. The *Pekin* defendant told an objectively false statement to mislead customers and ultimately lure them away. In contrast, Ricketts' statement was an analogy to explain his perspective on the contentious relationship between the Cubs and Rooftops—it was neither untrue nor misleading. Therefore, we find that Ricketts' statement did not violate the License Agreement's non-disparagement provision.

Seeking to avoid this result, the Rooftops argue that because they assert a breach of contract claim rather than a common law disparagement claim, we should apply principles of contract interpretation by analyzing the specific language in § 8.2 to determine if a breach has occurred. Consequently, the Rooftops contend that any statement that "abuse[s]" or "insult[s]" the Rooftops also breaches the non-disparagement provision.

To make this argument, the Rooftops rely on *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 380–81 (7th Cir. 2010), in which we used the dictionary definition of "disparage" to determine if a non-disparagement agreement had been violated under Indiana law. While this approach may have been appropriate under Indiana law, the Rooftops have not cited to any Illinois cases following a similar approach. Moreover, Illinois cases such as *Pekin* and *Lexmark* involve non-disparagement provisions of insurance policies, which are analyzed similarly to contracts; those courts used the "untrue or misleading" standard to analyze claims arguing breach of the policies' non-disparagement provisions. 799 N.E.2d at 526; 761 N.E.2d at 1218, 1225. Consequently, we reject the Rooftops' attempt to broaden the scope of the non-disparagement provision.

### D. Motion to Amend

The Rooftops argue that the district court erred in denying their motion to amend. Rule 15 provides that, as a general rule, a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts, nevertheless, "have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). Generally, we review a district court's denial of leave to amend for an abuse of discretion. *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015). However, "our review for abuse of discretion of futility-based denials includes *de novo* review of the legal basis for the futility." *Id*.

Here, the district court determined that the Rooftops' proposed amendments would be futile. The Rooftops' proposed amendments addressed their antitrust claims. The Rooftops sought to include Northside Entertainment Holdings, LLC as a defendant in an attempt to evade the Sherman Act's baseball exemption. However, Ricketts operates this entity, and it, in turn, owns and operates the Cubs. Based on our discussion of *Toolson* above, we find that the baseball exemption applies with equal force to Northside. If the exemption applied to the owner and general manager in *Toolson*, we see no reason that it would not extend to the entity that owns the Cubs, and the Rooftops have not offered a compelling one. Furthermore, according to the Rooftops' amended complaint, Northside is engaged in the same conduct as the other Cubs defendants that we already found exemplifies "the business of providing public baseball games for profit." Consequently, we agree with the district court that this amendment would be futile, as the baseball exemption applies to Northside. Based on this conclusion, we need not review the Rooftops' additional proposed amendments regarding the relevant market.

## II.  CONCLUSION

We **AFFIRM** the district court's dismissal of the Rooftops' suit.